Case number 14-3753 with cross-appeal 14-3832 Cranpark Inc v. Rogers Group Inc or arguments not to exceed 15 minutes per side. Mr. Mills for the appellant cross-appellee. Good afternoon. Good afternoon. May it please the court, David Mills on behalf of Cranpark Incorporated. I'm here with Michael Pasternak and Andrew Yarger, co-counsel. I'd like to reserve four minutes, please. Very well. Your Honors, this case has been through more than a decade of litigation, a previous trip to this court, and ultimately a unanimous jury verdict in my client's favor for $15.6 million. As you know, that verdict and that decade of litigation essentially were wiped out post-trial by the judge based on something everyone in this case knows is actually false. That is the idea that Cranpark, my client, had sold the right to bring this entire lawsuit way before it even began in 2001. How do we know that's not true? Well, we know it's not true because we have the document governing that sale. We have the asset purchase agreement and everyone's had it. It's unambiguous. It's on page 10 of the brief and it shows Cranpark indeed retained the right to bring this lawsuit. Not really a big deal in the early parts of this case and we know Roger's group knew Cranpark retained this right because they never even made an argument all along that the lawsuit was sold. They never moved under Rule 17 to say, hey, we're being sued by the wrong party because they had the same document. They had the same document in 2007 at Mr. Sabatini's deposition. They discussed it. Everybody knew that while Hard Drives, which is now Cranpark, had sold all of its assets, yes, essentially everything, everybody also knew it had clearly retained the right to bring this suit. So how in the world, after the jury's unanimous verdict in Cranpark's favor, was this all thrown out? Well, it's all about Article 3 standing. And the truth is Article 3 standing just has to do with the simple question of whether the plaintiff was injured by this defendant and whether an Article 3 court can redress that harm. That is undisputed in this case. That is undisputed in this case. That's how Article 3 works. So how did the magistrate judge throw this out? Well, there are a couple drive-by jurisdictional rulings, to use the language of Justice Ginsburg in the Arbaugh case, sort of a colorful way to describe this. What happens is, Atlanta Gas is about the best example of this. This is the Fourth Circuit unpublished decision cited by Rogers and that the magistrate judge relied on. What happens in these cases is the courts actually kind of come to the right outcome because what happens is the plaintiffs in those cases have really sold their rights to the lawsuit. Atlanta Gas really did sell its rights. The Atlanta Gas contract says, you sold all the claims. So the defendant there, early on in the litigation, says, you know, we're being sued by the wrong people. The court looks at the document and they say, you're right. The problem is it's really a dismissal or a summary judgment. The court says you don't have standing when it's rule 17. Exactly. It's sloppy language there and then it snowballs elsewhere. And that's the drive-by ruling they throw the language of jurisdiction on. Not really a big deal for the parties in that case because the outcome is correct. That person can't sue. They did sell the claim. Where it becomes really a disaster and an injustice is a situation like this and like in Arbo itself. Arbo itself also involved undoing of the entire verdict on what was allegedly jurisdictional grounds. And as the court unanimously pointed out, you know, that's really not correct. It's sloppy use of the word jurisdiction. That's exactly the sort of perfect storm that occurred here. And here we are post-trial. Everyone knows the truth. This one's marked Defendant Exhibit for Trial. It was not admitted at trial, but it's marked. Everyone knows about it. And this was the ultimate tactic because everyone knows Article 3 is sort of this giant, magical thing. You can raise it any time. It's never waived. And here's the other part. Under Lujan, when you're talking about Article 3 injury, you need to have proof of that injury at trial. No big deal. Mr. Sabatini testifies, I was ruined by Roger's group. No big deal. Run-of-the-mill case. What happened is they took those drive-by jurisdictional rulings and they said... Let me ask you about that Lujan quote. Yeah. Do you recall, is that specific to the injury and fact element of standing, or does it also say that redressability has to be shown at every stage, including a try? My reading is it actually goes to all of them. And the key part about that, this is the other part of where the problem lies, and some of the sloppiness is the redressability. I mean, that's really what's at issue here. There's no question. You're right. I mean, your client, I mean, looking at the trial testimony, I mean, you know, they suffered past tense and injury and fact. And really, I mean, the only tricky part seems to be redressability. But before we get to that, I mean, you know, you say it's a misreading of Lujan. I mean, I would think, and tell me if you think it's wrong, that in a case where standing actually is contested, I mean, Justice Scalia's sentence is he's walking it through. He says, you know, we go from motion to dismiss to SJ to trial. He's contemplating a case where it's actually contested, not one where it's first raised post-trial. And it would seem like if it is contested, yes, you look at the trial record. If it's not contested, then perhaps we shouldn't be limited to the trial record, because that, frankly, might be unfair to the plaintiff. And I guess that's an issue for the other side to talk about. But I don't know. I'm not so sure that it's being misread the way you say. Well, I think, you know, when you look at those cases like Lujan and, frankly, all the others, and every single one Roger's cite that says you need to look at the trial testimony for those different stages. Yeah, probably. I'd be curious. I mean, is there any such case where standing actually was not even mentioned until after trial? Well, there are certainly cases where the idea of, like, Article III standing is not mentioned until after trial, and Arbaugh is one of them, and that's where the court says, look, you can't do this. What I think is happening, though, in those cases is actually, you know, quite simple. All of those cases, without exception, Lujan, all the others they cite that say you've got to prove standing at trial, they're all about the injury, and the only time there's a problem is just like in Lujan when the environmental organization is suing, and they say, look, we're harmed by this government regulation that has to do with tangential effect literally on crocodiles in the Nile. Literally. And so the question is, and what Justice Scalia is saying is, do you have evidence that you were injured in the first place? And that's the thing that gets tricky, and they have to prove it at trial. And every single case that says that is like that. So I think the most straightforward reading in my mind is just that, yeah, you need to prove your injury at trial. Here it's a run-of-the-mill contract promissory estoppel case, so the second you get on the witness stand and say, yeah, it's me, and they harmed me, you're done. They concede this point. To your addressability question. That is kind of tricky, but go ahead, please. Yeah, I mean, I guess what I would say is in any case that's a basic tort claim or contract claim, the second you prove your prima facie case and you say it's really me and they harmed me, you're done. And Scalia points this out in Lujan. If it's about direct conduct from the defendant to you, it's pretty easy. If you're an environmental group talking about harm to one of your members, not being able to see a crocodile, it's more difficult. What makes it tricky, though, is the assignment. I mean, supposed assignment. And, I mean, let's say hypothetically you had a transaction where there are multiple companies that want to buy Cran Park. And one of them says, you know what, I know you're having this fight or you're contemplating a fight with Rogers Group. I'll tell you what, and you say your damage is about $15 million, I'll just give you 100 cents on the dollar for that, okay? And then you assign it to me and I'll take all the risk because I really want to buy the rest of the company. And then Cran Park sues. I mean, the idea that money is going to Cran Park or redressing an injury is kind of hard to square. Well, two things about that. First of all, obviously in that scenario, here's your document, Judge Kethledge buying the company and the lawsuit, not in your official capacity. Okay.  Cran Park doesn't own it. That's Atlanta Gas that, you know, Rule 17, get the right party in there. Now, why is there still Article 3 stand? Because Cran Park suffered the injury. Now, to your redressability concern, this is, again, I think helps explain why the magistrate judge got this so wrong because the redressability term starts to make you think, oh, and this is what Rogers points out in their brief, oh, this is no longer redressable under Article 3 since because you've sold the claim. Actually, that's not how redressability works under Lujan in all these cases. Now, in our brief, I pointed out in Moore's Federal Practice, I said there's about 16 cases they cite to explain what redressability really is. What it really is is more to the point the idea of whether it's actually speculative as to whether a court can, in fact, grant the relief that would make you whole. That's really all it is. So an example they cite, Sixth Circuit decision, I think it's called Morrison. Someone's suing about a school policy, about discrimination, and the policy's no longer in effect at some point. Well, a court can't redress that because there's nothing to fix. Lujan had a redressability problem. What can you do about the crocodile? What can you do? And the challenge government regulation in Lujan had to do with a suggestion of consultation with other entities that are doing these overseas things with these crocodiles, etc. Scalia says, look, you have a redressability problem because it's not clear that the relief the court's going to grant is actually going to fix what you want. In this case, if Cran Park sues the redressability problem in terms of their injury, is only whether a district court or, frankly, this court under its Article III authority, when it says judgment $15.6 million, is that a redressability satisfied? Real quick, I'd like to ask you about your prejudgment interest argument. Yeah. I mean, you calculate it in a table at the end. Right. With the assumption that all of the damages would be accrued, I guess would be the word, at the time of the Rogers repudiation of their promise. But some of those damages, as I understand it, were damages that were based on future profits, or am I mistaken? Because those would not have been, you know, you're getting interest on those in the years before they would have accrued or happened. Right. Well, okay. And to be clear, there's no future profits in terms of an expectation damage. I don't think you're saying that. Reliance. Reliance. Right. I think the short answer is there, and we break this down in the brief, but there's ample evidence from that time that the jury had to look at to say, how do we put Hard Drives Crane Park in the position it would have been? And that's the reliance instruction. And you've got, like, $3 million immediately for the plant, setting it up. But it would have gotten those monies later, so why should they get interest on those monies dating back to the time of the repudiation? I would say nearly the entire amount can be attributed to damages incurred at the time. Okay? You have $3 million right off the bat related to he buys this new plant, he's got to put a new road in for it, et cetera. That's immediate out of his pocket, out of Hard Drive's pocket. The other thing is you have the valuation of the company itself, which was doing fine, doing terrific, and the expert testifies it was worth $12 million and now it's only worth $4 because of this. That's an immediate devaluation of the company. So we're talking about $3 million plus another $5 million right there. The other thing is this company, Hard Drives, every single year for two decades is profitable. And now they're going to do this venture, Rogers backs out, what happens? They lose $383,000 the first year of the back out, they lose almost $4 million the second year. So that's also immediate. That's another $4 million. So I'm doing my math quickly. But I'm at about $14 million of the whole award. To the extent there is some piece of that that has to do with the fact that they would have continued to make some money, I would say it's possible, but it may only be about a million of the 15 that, you know. There's Ohio law we cite that says when you've figured this prejudgment interest out, you just look at the date it accrues, you know, the date the jury said that there was, you know, a breach. Is this an issue that we need to resolve on appeal as opposed to remand to the district court to figure this out in the first instance? Yeah, I mean, I think you definitely can resolve it. I think that the law is clear enough. I think, I mean, there's some back and forth in Ohio law. But if you look at the federal law on this, we cite three very recent federal cases that say you do get prejudgment interest. You're not asking this court to do the math. Yeah, that's what I'm saying. I mean, I thought your brief just asked us to find that you're entitled to prejudgment interest, and I was just reading your brief to see if you request a remand, and it's kind of ambiguous. But I thought it was implied that you wanted us to find, I mean, if we agreed with you, that you're entitled to prejudgment interest and the remedy would be a remand and the district court would calculate the amounts. Yeah, I understand the concern. I would say very briefly we certainly asked this court to say we're entitled to prejudgment interest. We put the numbers in there so that this court, if it so chose, could say here's the number. But we recognize that these appellate courts may not be always in the business of calculating out those numbers. We're not real good at math anyway. Yeah, fair enough. I see my time is up. Thank you very much. Good afternoon. Good afternoon. May it please the court, my name is David Cutick, and I'm here on behalf of Rogers Group. As counsel and you discussed, the issue here is whether, as Lujan requires, the plaintiff below proved their burden that they had standing by evidence adduced at trial. I have to ask, though, why did it take 10 years to bring this up? This case came to this court and went back. I mean, we wrote an opinion. It goes back 10 years of litigation, not a peep. Why? Lujan talks about that as well. Well, I'm asking a factual question, why nobody thought of this. Sure. Okay. The issue is, as Lujan talks about, at every stage of the case, what is the manner and quantum of proof that they have to bring forward to get over the hurdle at that time? Okay. So it's only because he says everything and his putative interpretation of this then opens the door to an argument? Is that really the theory here? Yes, it is. Is that the way we interpret contracts? Parole evidence first, text later? The fact of the matter is the only evidence in the record, the trial record, of the contract was his testimony. I guess on that point, again, I would say Lujan, that sentence, that clause of that sentence, I think would contemplate cases where the defendant or somebody has raised the issue of standing earlier. Lujan walks through the procedural phases of a case and says at each phase, and I think Lujan was 12B6, the plaintiff has to come forward with the evidence, which implies that somebody is contesting it as they did in Lujan. Well, let's look at it. And in a case where you don't mention a peep about this, it seems different to say actually, even though we never mentioned it in 10 years, you're limited to what you said at trial and we can't look at this clause here, which I think obviously implies that there was no assignment. Well, I disagree with you on that and we can talk about that later if you'd like. Okay. But the fact of the matter is that at each stage, we have to look at what was available for us to challenge. With respect to the complaint, the complaint said, we're the successor of interest to hard drives and we are the real party of interest, paragraph one of the complaint. We can't challenge that at that time. There's no basis under Rule 12 to challenge that. With respect to the summary judgment, they make the same allegation. We're the successor of interest. We're the real party of interest. Do they have evidence at that point? Issue of fact. I mean, if you're saying you would interpret this agreement, in fact, to transfer, I mean, this is your exhibit. You had it. You had it during discovery. We certainly did. Your Honor, summary judgment stage, they haven't met the Lujan standard for standing. At best, the asset purchase agreement is ambiguous because the asset purchase agreement doesn't list the assets, the choses of action, one way or another. Now, Judge Griffin, I had an issue. It enumerates what is assigned. It's just like the Constitution, Article I. It enumerates what's assigned. This is not among them. Now, I mean, this provision that the plaintiffs are relying upon, I would say, is actually a use of name provision, not a reservation. That said, that said, it very strongly implies that these things were not assigned. It's a use of name provision. Okay. And the question is, is it? Go ahead. I'm sorry. Please. Use of name to do what? To accomplish what? Correct. It's use of name. And the question is, are they using the name here to bring the lawsuit? And there's another clause to it, which is necessary for the winding up of the business. Well, there's a question, we think, of fact as to what does that mean. And the person who interpreted that. Pretty thin stuff. Well, certainly. But certainly. Why couldn't you make your Rule 56 argument that they have no standing? Because, again, they have. I would. You take his deposition. You get the same testimony you gave at trial. You make your argument to the district judge. I would. Rather than after trial. And it's really kind of got you. I'm not saying it was your intention. I disagree with that. I'm not saying it's your intention, but it's the effect. May I respond, Your Honor? When the point is not raised until after the proof's closed. Well, we raise this issue at the close of their evidence. 50A? Yes. That's a Rule 17 argument. Excuse me. May I give the rest of my answer, Your Honor? Sure. Okay. We raise the issue at the end of their evidence. The Rule 50A motion. Yes. Yes, indeed. And they had the opportunity to cure that, if they wanted to, by putting in the asset purchase agreement. And they did not do that. Instead, what they did is they told the judge something else. Okay. But let me just respond. And I disagree with you, Your Honor, that this is a Rule 17 motion. Okay. Because Lujan, again, talks to standing. I may have misplaced the testimony or the transcript. But the transcript, your argument is that they are not the proper party. The word standing appears nowhere in this transcript. That's correct. It's a Rule 17 argument. I mean, this seems tendentious, frankly. Your Honor, I disagree with that. Again, the issue was whether they had the right to be there. Right. And the same problem arises in Rule 17. Well, certainly, Your Honor, issues with respect to real party interests, certainly that's the name of the rule. The purpose of the rule started back in the 30s when there was a split in particular property between legal and equitable interests. Right. And it was to clear up the rule. It used to be unaccompanied law. You could only go ahead and sue if you had the legal title. Rule 17 says, no, if you're the equitable owner, you go ahead. So this is a case so Rule 17 is directed to where both parties have an interest, which is the right party to bring the suit in Rule 17 direction. If I may, what I'm saying is different. I understand. And standing is different. And you never use the word standing in the Rule 50A argument at any time. Is it too much to ask, if you're making a standing argument rather than a proper party argument, to use the word standing, not the words proper party, which is, in fact, what you use? Well, Your Honor, I think our argument could be fairly read to raise standing because they were not the proper parties. They had sold everything. They had no interest in this case. And, in fact, there's tons of caseload out there that we've cited, including from this court, which have said if you're an assignee and you've assigned the case, you're no longer standing. We cited the Edwards case. The Sprint case seems to be pretty tough for you on this point from the Supreme Court. I mean, they suffered an injury in fact, past tense, no question. It was caused by your client, no question. The only question is redressability. And Sprint takes this, you know, for better or worse, takes this metaphysical view that if the injury itself is redressable by some means in the court's power, then redressability is satisfied. And that's an assignee case. Why isn't that reasoning as to redressability binding on us for the same issue here? Well, I would disagree with your reading of the Sprint case. I think that case is consistent with a lot of other cases in where you have the cutting off of the interest, like in Edwards. Other cases that we've cited from the Tenth Circuit, the Federal Circuit Schreiber, for example, is a good case, where the individual had a patent. He signs his patent and the court says the time he signs his patent, he doesn't have standing to sue on the patent anymore. And they use standing language in there. There are cases from the Tenth Circuit, the CNA construction case, for example. There's another case. Now, there's issues with respect to drive by standing. I mean, that's something that counsel mentioned that you're keyed in on. And with respect to those cases, you know, the Arbaugh case, or a case like Lexmark, none of those cases have criticized the cases that we're relying on, the cases where there's an assignment that cuts off the interest of the individual to bring the action. Well, it cuts off the interest. Let's translate that to Lujan Article 3. Sure. That has no injury and no regressibility. Suffered injury in fact. You would agree they did that, right? No. Once you lose the right to bring the lawsuit, you have no injury. Once you sell the right to bring the lawsuit, you don't have a regressible claim. What case says that? Well, Your Honor, I believe the cases that we've cited. Like what? Well, CNA, for example, is one. Schreiber is another. They actually said that the party that, in fact, suffered the injury for purposes of standing has not suffered an injury in fact? No. What they've said is that that party no longer has a regressible injury. Well, that's regressible. See, I'm not talking about. Okay. I understand your argument about regressibility. I think the problem is the Supreme Court has rejected it in Sprint. But I was asking about injury in fact. It seems they did suffer an injury in fact at the hands of your client, at least on their theory. And really the only question regarding standing is regressibility. Isn't that a fair narrowing of the issue before us? Well, certainly, Your Honor, I agree that regressibility is an issue. Do you agree that they satisfy injury in fact, they satisfy causation, because those things actually happened in the world? Well, Your Honor, I don't think we've raised causation as an issue. I think our point is that. I'm trying to clean up the analysis that we have to do. Do you agree that they satisfy those two elements and we just have to look to regressibility? I don't agree that they've satisfied the injury requirement. I don't agree that they've satisfied the regressibility requirement. Okay. And again, Your Honor, the issue for us is all these cases that we've talked to you about where the assignment cuts off the right in all these cases which talk about standing. The criticisms of drive-by jurisdiction have basically taken the analysis like in the Lexmark case where they say, you know, if you don't meet the statutory requirements, you don't have a cause of action. That's a Rule 12b-6 motion. That's not a 12b-1 motion. This is different. This is about interest to have an injury and to be redressed. Those are pure standing requirements, and courts have time and time again used standing including this court in the Edwards case. Now, I want to address the issue of promissory stopping. You did ask about that, so I'd like to have an opportunity to talk about that, and particularly on the prejudgment interest. The issue generally is a failure of proof here. Again, there's no issue with respect to or there's no evidence with respect to a promise. The jury found that the writing wasn't a contract. So that's not a promise that's good enough to rely on for promissory stopping. So they come in with two other things. One is the word great. Mr. Stump gets a call from Mr. Sabatini. Mr. Sabatini says, I'm going to buy this plant, and Mr. Stump says great. Well, that's not good enough in terms of a specific promise. We've cited the Heinz case where an individual says, I'm in 100%, or the Zapata case, which they say, we'll work with you. That's not good enough. There has to be a specific promise to do a specific thing. They don't have any promise. Then they say, well, we have this course of conduct. They were in. They were looking at. They were drawing plants up. They were doing projections. They were testing aggregate. That's rock. Well, the fact of the matter is we've cited cases, the Anderson case, for example, the Greenco case, the Telzon case, all these cases where there's a course of conduct and it's all subject to some further final agreement. Just like this case, the writing of September of 1998, was subject to management approval. So what courts have said is all those things are things that the plaintiff undertook as a risk for not getting a final agreement. It's a business risk you take, and you can't force that on the defendant, and that's what they're trying to do here. There's no evidence of promissory estoppel, nor is there evidence of damages beyond a couple hundred thousand dollars. The only thing that happened before Mr. Stump told Mr. Sabatini that the project was not going to go forward in February of 1999 was that Mr. Sabatini had purchased, or rather said, put a down payment on an asphalt plant. That's less than $400,000. When asked at trial, couldn't have you gotten out of it? He said, yes, probably for, again, off the top of his head, $800,000, $900,000. All the rest of these damages, these supposed lost profits and the value of the business, are specifically based on Mr. Sabatini continuing with the project that Rogers did not want to go forward with. So he took the risk of going forward. He could have gone back to his Mineral Street plant, which was still in operation, and continued with the same operations that he had. So the elements of damages certainly didn't accrue on February, in February of 1999. But Mr. Stump said in an email that what Rogers is doing could put Crant Park out of business. I mean, that would let the jury conclude it wasn't just sort of a self-inflicted injury. Well, the question is, what's the promise? I understand that's a separate argument. There's a lot of activity that one perhaps could construe to be. It's why it's not a breach of contract claim before us. Well, again, if you look at the same type of cases where there are lots of course of conduct that follows, the issue is when you go forward, which is subject to a final or further agreement, can you claim that that going forward is enough and the cases are unanimous? The answer is no. So there certainly wasn't any evidence of a promise. There wasn't any damages beyond $300,000 or $400,000, $800,000 or $900,000 at most. And certainly nothing accrued after that in terms of the ability to get pre-judgment interest. As we indicated in our brief, they're not entitled to pre-judgment interest because we believe under Ohio law, all that's required for pre-judgment interest is that it be a verbal contract, and a promissory estoppel is not a verbal contract. Thank you. Thank you. Mr. Buttle. So real quick, back on this Article 3 point. I don't want to take a lot of time, but I just want to remind the Court about the White decision of the Sixth Circuit we rely on heavily. The underlying point here, and I think this Court's recognized it, there's really a two-step process. Is there Article 3 standing, which I say and I think Lujan says, were you injured by this defendant? Can a court redress it? That's really it, and I think this Court's decisions in White explain that. White says itself, this is not an Article 3 case. That's the one with the check where he transferred possession to the company. They say this is not an Article 3 matter. It's just a real party, proper party and interest. It's a legal defense the defendants have to raise. So the truth is, an assignment of the claim, if you've really been injured by the defendant and a court has the ability to redress it, you have Article 3 standing. The question is, if there's an assignment or an alleged assignment, it's the defendant's burden to prove that that's the case. And if they're right, they're right. Now the cases they cite in Reliance are, you know, the Atlanta gas decision we talked about. I heard mentioned CA Construction and Schreiber Foods. As we point out in the third brief, when you really look at those cases, those courts are expressly doing an analysis involving what's called prudential standing. This is exactly what... Which part of it? Pardon me? Which part of prudential standing? Well, I think what they're talking about, I mean, these opinions get a little sloppy, but I think they're talking about prudential concerns, about the idea of what happens in assignment cases, which is you're raising the interest that is now owned by somebody else, even if you were originally injured. The 28J letters here, which cite some recent cases and don't go into much depth on them because of the word limit, are, I think, really worth looking at because the courts are getting more precise in exactly the way the Supreme Court is saying. We cite three cases at the end of the 28J letter that actually go into detail about this Article 3, Rule 17 distinction. One of them called something like suja. The defendants pull a sort of similar tactic, and the judge says, you can't change your real party argument that you lost and now reinvent it as Article 3. There's a couple cases like that. It sort of clears it up. Let me briefly respond to these points. This is a promissory estoppel point, very briefly. This is promissory estoppel 101. Jury rejects the September 1 document, the handwritten document, and says, you know, it's not a contract. It's not formal enough in September. But what happens in the three and a half months after that when Sabatini is talking to Stump two to three times a week? They have two major conditions in that handwritten agreement. We've got to get the site. We've got to get the site approved at Center Street, and we've got to get the rail rate the way we need it. Two and a half, three and a half months, Rogers Group emails from Rogers Group. We got the site. Our site is approved. We're ready to go. It's great. Rail rate, we finally got a solid rate. Culminating, they put on a map from Rogers Engineers where this new plant's going to be. Everything's a go. And this is not just one word of testimony. This is hours in front of the jury, Mr. Sabatini and Mr. Stump, and the jury's trying to figure out was there a promise here. And then you get to December, and Mr. Sabatini and Hard Drives are at the point of no return. They're ready to buy this $1.5 million plant. It's going to be the biggest in the state. He calls up Rogers Group. I need to know you're with me. Yeah, they're with him. We're talking about a jury trial where Cran Park won the jury trial, and the jury can make those inferences that when Sabatini was at the moment of no return, three and a half months in, all the conditions are met, are you with me, are you promising to be with me. The Rogers Group cases are exactly the opposite of that. What about the condition of management approval? Yeah, that's fine. I mean, maybe that's one reason the jury thought it wasn't a contract. That's fine. But the question is, and Rogers Council at closing told the jury, even if you reject a contract, we've got to go to promissory stop. You better find a promise. You have to find a promise. And in December, as this court pointed out in its first opinion, the other promise was this December situation of, are you promising to continue to be part of this? Because this is going to be a bet-the-company situation. He's doing fine for 20 years, and he says, I'm going to put everything I can into your promise that you're going to be with me on the same map you produced. I see my time is up. I thank you, and we request judgment. All right. Thank you very much. The case will be submitted. Thank you very much.